**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL B. RUSSELL, (M38048), | ) | |
| | ) | |
| Petitioner, | ) | Case No. 20-cv-3863 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| DAVID GOMEZ, WARDEN, | ) | |
| STATEVILLE CORRECTIONAL | ) | |
| CENTER, | ) | |
| | ) | |
| Respondent. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Petitioner Michael B. Russell, an Illinois prisoner at the Joliet Treatment Center, brings this *pro se* habeas corpus action under 28 U.S.C. § 2254. He challenges his 2013 conviction for first degree murder in the Circuit Court of Cook County. *See* Petition (Dckt. No. 1). The Court denies the petition on the merits and declines to issue a certificate of appealability.

**I.   Background**

The following facts come from the Illinois state court record. *See* State Court Record (Dckt. No. 13). In particular, the Court relies on the state appellate court's decision on direct appeal, *People v. Russell*, 2016 IL App (1st) 132363-U ("Direct Appeal Order"), and the post-conviction trial court's dismissal of Petitioner's claims on the merits.[1] *See* 6/30/16 Direct Appeal Order (Dckt. No. 13-4); 11/17/20 Post-Conviction Trial Court Order (Dckt. No. 13-7).

---

[1]  Although a decision was issued on post-conviction appeal, the Illinois appellate court simply granted Petitioner's counsel's motion to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), and affirmed the post-conviction trial court's judgment without further discussion. *See* 10/17/19 Post-Conviction Appellate Court Order (Dckt. No. 13-10). Thus, the Court "looks through" the appellate court's decision to the post-conviction trial court's factual findings. *See Thomas v. Watson,* 2020 WL 1701883, at *6, n.3 (N.D. Ill. 2020) (citing *Wilson v. Sellers,* 138 S. Ct. 1188, 1192 (2018)).

The state court's factual findings are presumed correct unless Petitioner rebuts this presumption by clear and convincing evidence.   *See Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020) (citing 28 U.S.C. § 2254(e)(1); *Perez-Gonzalez v. Lashbrook*, 904 F.3d 557, 562 (7th Cir. 2018)); *see also Ward v. Hinsley*, 377 F.3d 719, 721 (7th Cir. 2004) ("[W]e presume the state court's recitation of the facts to be correct.").   Petitioner has made no such showing.

### A.      Petitioner's Trial

The underlying case is about the fatal shooting of Tito Lindsey on August 9, 2010.   The State of Illinois ultimately charged Petitioner with six counts of first degree murder.   *See* 6/30/16 Direct Appeal Order, at ¶ 4 (Dckt. No. 13-4).   The State pursued a theory of accountability, which meant that even if there were two shooters involved in Lindsey's death, a jury could find Petitioner accountable for the actions of the other shooter.   *See* Trial Tr. (Dckt. No. 13-14, at 499 of 707).

After a jury trial in the Circuit Court of Cook County, Petitioner was convicted of first degree murder on July 1, 2013.   *See* 11/17/20 Post-Conviction Trial Court Order, at 1 (Dckt. No. 13-7).   The jury returned a verdict of guilty under a theory of accountability.   *See* 6/30/16 Direct Appeal Order, at ¶¶ 2, 4 (Dckt. No. 13-4).

The jury found that the State had proven that Petitioner committed first degree murder and had personally discharged a firearm during the offense.   *Id.* at ¶¶ 4, 77.   But the jury did not find that Petitioner had discharged the weapon that proximately caused Lindsey's death.   *Id.*

### 1.      Pre-Trial

At trial, Petitioner offered the affirmative defense of self-defense.   He basically argued that he fired a weapon because Shaheed Muhammad, the victim's cousin, fired at him first.   *See*

6/30/16 Direct Appeal Order, at ¶ 69 (Dckt. No. 13-4).   Muhammad was with Lindsey when Lindsey was shot.   *Id.* at ¶¶ 13–15

Petitioner offered support for that affirmative defense before trial.   He tendered police reports about three different arrests of Muhammad.   *Id.* at ¶ 10; *see also* Trial Tr. (Dckt. No. 13-13, at 342–43 of 700).   The theory appears to be that Muhammad was a violent person, which supported the notion that he was the initial aggressor in the shooting.   *See* 6/30/16 Direct Appeal Order, at ¶ 70 (Dckt. No. 13-4).

In response, the State filed a motion *in limine*, seeking to bar evidence of Muhammad's violent character.   *Id.* at ¶¶ 10, 71.   The State argued that such evidence was not admissible under Illinois law because Muhammad was not a victim of the crime, but rather was a bystander. *Id.*

The trial court reserved its ruling on the State's motion pending the evidence presented on Petitioner's claim of self-defense.   *Id.*

### 2.    The State's Case-in-Chief

At trial, the State presented several witnesses, including two eyewitnesses.   *Id.* at ¶¶ 11–18, 24–31.   The State called Muhammad (again, the victim's cousin) to the stand.   The State also called Jennifer Schulz, an off-duty paramedic who helped Lindsey after suffering the fatal wounds.   Other witnesses testified as well, including the owner of the getaway car and several law enforcement officers.

Muhammad testified about the shooting itself, and about the events leading up to it.   He testified that he slept at Lindsey's house the night before the shooting.   *Id.* at ¶ 13.   In the morning, Muhammad and Lindsey walked to the gas station to purchase some items before Lindsey had to leave for work.   *Id.*   On the way there, Muhammad noticed a vehicle with four

people drive past and observed one of the individuals in the backseat turn around and watch them. *Id.*

According to Muhammad, the same vehicle pulled up next to Lindsey and Muhammad on their way back from the gas station. *Id.* at ¶ 14. Four people jumped out of the vehicle, including Petitioner. *Id.* Petitioner and the driver were both armed; Lindsey and Muhammad were not. *Id.* Muhammad heard the driver say, "don't do it." *Id.* Lindsey and Muhammad took off running in different directions out of fear that the occupants of the car were about to start shooting. *Id.*

As Muhammad was hopping over a gate of a nearby house, he heard one of the men shout, "shoot, shoot." *Id.* at ¶ 15. Four or five gunshots followed. *Id.*

When he landed on the other side of the gate, Muhammad saw Lindsey fall to the ground, and Muhammad realized that Lindsey had been shot. *Id.* Muhammad did not know who had shot his cousin. *Id.* at ¶ 17. Muhammad tried to drag Lindsey back to Lindsey's home, but only moved him a few feet before Lindsey lost consciousness. At that point, Muhammad ran to his cousin's house to get his family. *Id.* at ¶ 15.

When Muhammad returned to Lindsey, a paramedic was tending to the victim. *Id.* Muhammad spoke to the police when they arrived. He later identified Petitioner from a photo array and physical line-up as one of the individuals he saw exit the vehicle with a handgun. *Id.* at ¶¶ 15–16.

Muhammad testified that he recognized Petitioner from an incident a week before the shooting. *Id.* at ¶ 12. He was at Lindsey's house when two of their friends rushed inside claiming that they were being chased by someone with a gun. *Id.* Muhammad and Lindsey went outside to assess the situation and saw Petitioner and another individual. *Id.*

4

Petitioner yelled, "get on the ground, I got a gun" and made a motion under his shirt. *Id.* Lindsey called Petitioner's bluff about having a weapon. *Id.* Petitioner's friend then punched Lindsey, and a fight broke out among the four of them which lasted 10 to 15 minutes before Petitioner and his friend left. *Id.*

Muhammad also divulged the fact that he had had his own run-ins with the law. He testified that in July of 2012, he pled guilty to a misdemeanor battery involving two female victims in exchange for a one-year conditional discharge. *Id.* at ¶¶ 17–18. Also, he violated the terms of the conditional discharge two months later when he was charged with another misdemeanor offense. *Id.* Muhammad did not inform the State that he was a witness in a murder case, and he did not receive any plea offers in exchange for his testimony. *Id.* at ¶ 18.

Jennifer Schulz – the paramedic who assisted Lindsey after he was shot – testified at Petitioner's trial, too. *Id.* at ¶ 15. Her shift had ended that morning, and she was driving near the gas station when she heard three gunshots. *Id.* at ¶ 25.

Schulz testified that she saw Petitioner chasing Lindsey with his arm extended and holding a black, semiautomatic weapon. *Id.* As she approached the intersection, she saw a "grayish purplish" Ford Taurus and observed the silhouettes of two or three individuals inside. *Id.* Schulz swerved towards Petitioner, but straightened her car back out after he pointed his gun at her. *Id.* at ¶ 26.

She turned her car around, faced the direction of the armed chase, and observed Petitioner fire two shots at Lindsey. *Id.* Petitioner then ran in the direction of the Ford Taurus, and the vehicle drove away. *Id.*

Schulz testified that she called 911 and went to help Lindsey until the other paramedics arrived. *Id.* at ¶ 27. She saw Muhammad attempt to drag the victim after he had fallen. *Id.*

When she approached, Schulz observed that Lindsey was bleeding and had a gunshot wound to the middle of his chest. *Id.* at ¶ 28.

Schulz described what she observed to the police officers once they arrived on scene. *Id.* That day, she identified the Ford Taurus as the getaway car. *Id.* She later identified Petitioner as the shooter from a photo array and a physical line-up. *Id.* at ¶ 29.

The owner of the Ford Taurus, Santrice Lewis, testified as well. *Id.* at ¶ 20. Lewis testified that she was dating Petitioner's brother at the time of the murder and had loaned her car to Petitioner earlier that morning because he needed to drive to the gas station to get hydrogen peroxide for a wound on his foot. *Id.*

When she woke up a few hours later, she saw that Petitioner had returned her keys. *Id.* at ¶ 21. Her vehicle, however, was no longer parked in front of Petitioner's house where she had left it. *Id.* at ¶¶ 20–21. Instead, Lewis found her vehicle on the next block with police officers around it. *Id.* at ¶ 21. She asked Petitioner why the police were behind her car, but he did not respond. *Id.*

Law enforcement personnel took the stand, too. Detective James Carlassare testified that he recovered .380 caliber shell casings from the street where the shooting occurred and from the driver's seat of the Ford Taurus. *Id.* at ¶ 35.

Forensic Scientist Toni Brubaker testified about the ballistics. He explained that all .380 cartridge casings were fired from the same firearm. *Id.* at ¶ 43. Two .22 caliber bullets were also recovered from Lindsey's body. *Id.* at ¶¶ 41, 43. Brubaker could not determine whether the .22 caliber bullets were fired by the same firearm, but explained the gun that fired the .380 cartridge casings could not have fired the .22 caliber bullets. *Id.* at ¶ 43.

6

### 3.     Petitioner's Testimony

Petitioner testified on his own behalf at trial.   He offered a different version of what happened.   *Id.* at ¶ 53.

Petitioner acknowledged that he was familiar with Muhammad and Lindsay before the day of the shooting.   In fact, he testified that they had a history of fighting.   And most importantly, he admitted that he fired a gun several times during the incident when Lindsey was killed.

Petitioner explained that he encountered Muhammad and the victim a week or two before the shooting while playing dice at the park.   *Id.*   Petitioner had won $300 from Lindsey, but Lindsey demanded that he return half of the winnings.   *Id.*   Petitioner rebuffed his demands, collected the money, and left the park.   *Id.*

As Petitioner was walking home, he was jumped by Lindsey, Muhammad, and some other men who started punching him and took the money out of his pocket.   *Id.* at ¶ 54. Petitioner was not afraid of Muhammad or Lindsey, so he found some friends to help him get his money back.   *Id.* at ¶¶ 55, 65.   Lindsey told Petitioner he would have to get his money "like Tyson," which he understood to mean he had to fight for it.   *Id.* at ¶ 55.   They fought each other for some time until Petitioner eventually left, claiming he no longer cared about the money.   *Id.*

The three men fought again a few days later.   *Id.* at ¶ 56.   Petitioner had returned to the park to play dice when Lindsey and Muhammad approached.   *Id.*   Since they had already "fought it out," Petitioner did not believe there would be a problem, *id.*, but Muhammad and

Lindsey attacked him and beat him up with "their fists and their feet." *See* Trial Tr. (Dckt. No. 13-14, at 374 of 707); 6/30/16 Direct Appeal Order, at ¶ 56 (Dckt. No. 13-4).

On the day of the shooting, Petitioner got up early to use the bathroom when he stepped on a nail. *See* 6/30/16 Direct Appeal Order, at ¶ 57 (Dckt. No. 13-4). He woke up Lewis to ask to borrow her car to go to the gas station to get hydrogen peroxide to clean his foot. *Id.* While he was driving, he saw Jarvis Thomas ("Jarvo") and Richard Bynum ("Rico"). *Id.* at ¶ 58. Jarvo asked if Petitioner would give him a ride to purchase marijuana, and Petitioner obliged. *Id.* Rico then asked Petitioner if he could give him a ride to his house so that he could change his clothes. *Id.* at ¶ 59.

On the way back from Rico's house, Petitioner saw Lindsey and Muhammad walking out of the gas station. *Id.* at ¶ 60. Petitioner explained that he wanted to talk to them and "nip in the bud the altercation," so he could return to the park to play dice without incident. *Id.* at ¶¶ 60–61. He told his friends he needed to "holler at these dudes real quick," and turned the car around to drive back toward Lindsey and Mohammed. *Id.* at ¶ 60. He parked the car in the middle of the street and got out to try and speak with them. *Id.* at ¶ 61.

Lindsey, however, punched Petitioner in the jaw and then continued to punch him two or three more times. *Id.* Petitioner then heard a gunshot and saw Muhammad moving backwards and shooting a revolver. *Id.* at ¶ 62. To avoid being shot, Petitioner dove back into the Ford Taurus with Jarvo and Rico. *Id.*

Petitioner heard three more gunshots, and Rico handed him a semiautomatic weapon and told him, "shoot back, shoot back." *Id.* Petitioner fired the gun three times, once at the side of the Ford Taurus and twice in the air. *Id.* at ¶ 63 ("Defendant exited the vehicle with the

handgun. . . .   Defendant fired the weapon, but he did not aim at anyone.   He fired once at the side of the vehicle, and two more times in the air.").

After Muhammad and Lindsey ran away, Petitioner returned to the Ford Taurus and drove home.   *Id.*   He explained that he had to park a block away from his house because the vehicle "shut off."   *Id.* at ¶ 66.   He did not call the police to report the incident.   *Id.* at ¶ 63.

When Petitioner was arrested a few weeks later, he did not tell the police about the prior altercations that he had had with Muhammad and the victim.   *Id.* at ¶ 64.   He also did not tell the police that Muhammad had fired the first shots, or that Petitioner himself had fired a handgun.   *Id.* at ¶ 67.   Instead, he denied all participation in the shooting and claimed that Rico was the sole shooter.   *Id.*

Following Petitioner's testimony, defense counsel renewed his motion to present evidence of Muhammad's violent character (a so-called *Lynch* motion).   *Id.* at ¶ 70.   Petitioner sought to present two police officers who were involved in an aggravated assault where Muhammad "took a swing" at one of them in November 2011, as well as the two women who were involved in the July 2012 battery when Muhammad struck one of them and ran off with her purse.   *Id.*

The trial court denied Petitioner's motion.   The trial court found that evidence of Muhammad's violent character did not fit within Illinois's initial aggressor case law because Petitioner's testimony suggested that the incident arose after a verbal dispute between Petitioner and Lindsey – not Petitioner and *Muhammad* – had escalated into a fist fight.   *Id.* at ¶ 72.   That is, Petitioner was not asserting self-defense against *Muhammad.*   The trial court decided that evidence of Muhammad's violent character would not shed light on the question of who was the initial aggressor.   *Id.*

9

### 4. Jury Instructions and Deliberations

At the close of the evidence, the trial court held a jury instruction conference. *See* Trial Tr. (Dckt. No. 13-14, at 476-508 of 707). The court permitted an instruction on accountability over Petitioner's counsel's objection, explaining that the jury could reasonably find Petitioner accountable for the acts of another if the jurors found there were two shooters coming from the Ford Taurus. *Id.* at 499; 6/30/16 Direct Appeal Order, at ¶ 74 (Dckt. No. 13-4).

Later, the court instructed the jury on self-defense and second degree murder based on an unreasonable belief in the need for self-defense. *See* 6/30/16 Direct Appeal Order, at ¶ 74 (Dckt. No. 13-4).

After jury deliberations, Petitioner was convicted of first degree murder under a theory of accountability and sentenced to 55 years in prison, including 20 years for a firearm enhancement. *Id.* at ¶¶ 2, 77; *see also* 730 ILL. COMP. STAT. 5/5-8-1(a)(1)(d)(ii) (requiring sentencing enhancement for first degree murder when the offender personally discharged a firearm during the commission of the offense).

### B. Petitioner's Direct Appeal

Petitioner appealed his conviction, arguing: (1) the trial court erred in barring evidence of Muhammad's violent character; and (2) the trial court abused its discretion in permitting testimony about Petitioner's electronic monitoring in violation of the Juvenile Court Act. *See* Petitioner's Brief on Direct Appeal (Dckt. No. 13-1). The Illinois appellate court rejected both arguments and affirmed his conviction. *See* 6/30/16 Direct Appeal Order, at ¶¶ 110–11 (Dckt. No. 13-4).

Petitioner raised the character evidence issue in his petition for leave to appeal to the Supreme Court of Illinois, which was denied.   *See* Petition for Leave to Appeal (Dckt. No. 13-5); *People v. Russell*, 60 N.E.3d 880 (Ill. 2016).

### C. Petitioner's Post-Conviction Proceedings

In his *pro se* petition for post-conviction relief, Petitioner raised two claims of ineffective assistance of appellate counsel.   *See* Pro Se Post-Conviction Petition (Dckt. No. 13-6).

First, Petitioner alleged that his appellate counsel was ineffective for failing to raise an argument about the sufficiency of the evidence on direct appeal.   He argued that the evidence was insufficient to support his conviction for first degree murder under a theory of accountability.   *Id.*, at 6–21.

Second, Petitioner contended that appellate counsel was ineffective for failing to raise a "reasonable doubt" argument.   He pointed out that he was found guilty under a theory of accountability based on Muhammad's impeached testimony.   *Id.* at 22–30.

The trial court dismissed the post-conviction petition.   *See* 11/17/20 Post-Conviction Trial Court Order (Dckt. No. 13-7).

On appeal of that order, Petitioner's court-appointed post-conviction appellate counsel filed a motion for leave to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). *See* Mtn. for Leave to Withdraw as Counsel on Appeal (Dckt. No. 13-8).   Petitioner responded to the *Finley* motion, arguing that (1) his conviction was "legally inconsistent" with the jury's finding that he did not proximately cause Lindsey's death; (2) his appellate counsel was ineffective for failing to challenge the sufficiency of the State's evidence; and (3) the evidence was insufficient to support his conviction under a theory of accountability.   *See* Petitioner's Resp. to Mtn. for Leave to Withdraw as Counsel (Dckt. No. 13-9).

11

The post-conviction appellate court agreed with Petitioner's counsel that an appeal would be meritless and granted the *Finley* motion. *See* 10/17/19 Post-Conviction Appellate Court Order (Dckt. No. 13-10).

Petitioner sought leave from the Supreme Court of Illinois to appeal the dismissal. His initial petition for leave to appeal and supplemental briefing[2] appear to argue the following claims: (1) appellate counsel was ineffective in failing to challenge the sufficiency of the evidence to convict him for first degree murder under a theory of accountability; (2) the post-conviction appellate court erred in granting counsel's *Finley* motion; (3) his indictment failed to comply with statutory requirements and implicated the Double Jeopardy Clause; (4) the court lacked jurisdiction to instruct the jury on accountability; (5) trial counsel was ineffective for failing to challenge the court's jurisdiction to give the jury instruction on accountability; and (6) appellate counsel was ineffective in failing to argue the aforementioned errors of the trial court and trial counsel on direct appeal. *See* Petition for Leave to Appeal (Dckt. No. 13-11, at 2–8 of 89); *see also* Petition for Leave to Appeal (Dckt. No. 13-11, at 60–70 of 89) (handwritten version).

The Supreme Court of Illinois denied his petition for leave to appeal. *See People v. Russell*, 144 N.E.3d 1170 (Ill. 2020). Petitioner then filed this 28 U.S.C. § 2254 petition.

## II.    Analysis

Petitioner advances three basic claims in his petition under § 2254. *See* Petition (Dckt. No. 1). The first argument is about the evidence. The second argument is about his appellate

---

[2]  The record indicates that Petitioner initially filed his petition for leave to appeal in August 2019 and simply attached his response to his counsel's *Finley* motion as his argument. *See* Petition for Leave to Appeal (Dckt. No. 13-11, at 2–8 of 89). Petitioner later submitted an affidavit wherein he references that a state court granted him leave to supplement his petition for leave to appeal with additional claims. *See* Affidavit (Dckt. No. 13-11, at 58 of 89).

counsel. And the third argument is about double jeopardy.

In his first claim, Petitioner argues that the trial court erred in barring evidence of Muhammad's violent character to support his theory of self-defense.

In his second claim, Petitioner contends that appellate counsel provided ineffective assistance on direct appeal. He advances three reasons to support that claim.

Each reason focuses on some aspect of the trial that he thinks appellate counsel should have challenged. He begins by arguing that his appellate counsel failed to challenge the sufficiency of the evidence to support a conviction for first degree murder under a theory of accountability. Next, Petitioner faults appellate counsel for failing to challenge trial counsel's effectiveness. He points to trial counsel's failure to object to the accountability instruction, and failure to request a judgment notwithstanding the verdict (JNOV) or an acquittal. Finally, Petitioner claims that appellate counsel was ineffective because he failed to challenge the trial court's decisions to permit the jury to be instructed on accountability, and to not enter judgment in his favor.

In his third claim, Petitioner argues that the appellate court erred in affirming Petitioner's conviction because it did not consider that indicting Petitioner as the principal, but instructing the jury on accountability, might violate the Double Jeopardy Clause of the Fifth Amendment.

To obtain federal habeas relief, Petitioner must demonstrate that the state court's decision was either "contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States," or that the state court decision was based upon "an unreasonable determination of facts" in light of the evidence before it. *See* 28 U.S.C. § 2254(d); *see also Harrington v. Richter*, 562 U.S. 86, 100 (2011); *Williams v. Taylor*, 529 U.S. 362, 412 (2000). It is a "highly deferential standard for evaluating state-court rulings"

13

that is "difficult to meet," and it "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotations and citations omitted).

In addition to this deferential standard, federal habeas relief is only available where "the [petitioner] has exhausted the remedies available in the courts of the State" and has not procedurally defaulted his claims. *See* 28 U.S.C. § 2254(b)(1)(A); *see also Lewis v. Sternes*, 390 F.3d 1019, 1025 (2004). To avoid a procedural default, a petitioner must fairly present the operative facts and controlling legal principles of each claim through "one complete round of the State's established appellate review process," including the filing of a petition for leave to appeal to the Supreme Court of Illinois. *See O'Sullivan v. Boerckel*, 526 U.S. 828, 845 (1999); *see also Lewis*, 390 F.3d at 1025–26; *Johnson v. Hulett*, 574 F.3d 428, 431 (7th Cir. 2009).

A procedural default will bar federal habeas relief unless Petitioner can demonstrate "both cause for and prejudice stemming from the default," or "that the denial of relief will result in a miscarriage of justice." *Lewis*, 390 F.3d at 1026 (citations omitted).

Respondent correctly argues that Petitioner's claims are either meritless or procedurally defaulted. Petitioner is therefore not entitled to federal habeas relief.

## A.  The Evidence (Claim I)

Petitioner begins by arguing that the trial court violated his constitutional right to put on a defense when it barred evidence of Muhammad's violent character. *See* Petition, at 5–7 (Dckt. No. 1).

Specifically, Petitioner wanted to introduce testimony that, after the shooting, Muhammad faced charges of aggravated assault of a police officer and battery of two individuals. *See* 6/30/16 Direct Appeal Order, at ¶ 83 (Dckt. No. 13-4). Petitioner contends

14

that the evidence was material to his affirmative defense of self-defense. He also argues that the evidence was necessary for him to establish that he could be found guilty only for second degree murder because of his belief (albeit an unreasonable one) that force was necessary to prevent imminent bodily harm. *See* Petition, at 5–7 (Dckt. No. 1).

For this purposes of this Court's review, the relevant judgment is the state appellate court's decision on direct appeal, which is the last reasoned decision on this claim.[3] *See Greene v. Fisher*, 565 U.S. 34, 40 (2011).

On direct appeal, the state appellate court acknowledged that Petitioner had raised due process and fair trial claims with respect to the trial court's exclusion of evidence of Muhammad's violent character. *See* 6/30/16 Direct Appeal Order, at ¶ 83 (Dckt. No. 13-4). But the appellate court did not expressly address whether Petitioner's constitutional rights were violated.

Instead, the appellate court concluded that the trial court did not abuse its discretion in barring the proffered character evidence based on Illinois law. *Id.* at ¶ 87. The appellate court also ruled that, even if the trial court committed error, the error was "harmless beyond a reasonable doubt because [Petitioner] was able to present substantial evidence concerning Muhammad's propensity to violent behavior." *Id.* at ¶¶ 85–86, 93 (citing *People v. Cleveland*,

---

[3] Arguably, Claim I is procedurally defaulted given that Petitioner's petition for leave to appeal on direct appeal – a necessary step for §2254(b) exhaustion – did not raise a constitutional challenge, but rather argued evidence of a third-party's violent character is admissible under Illinois law. *See* Petition for Leave to Appeal, at 2–21 (Dckt. No. 13-5). This Court, however, will not explore the exhaustion question as to Claim I further because procedural default is an affirmative defense that is subject to forfeiture, *Cheeks v. Gaetz*, 571 F.3d 680, 686 (7th Cir. 2009) (internal quotations and citations omitted), and Respondent does not raise a procedural default argument with respect to this claim. *See* Resp.'s Answer (Dckt. No. 12).

488 N.E.2d 1276, 1283 (Ill. 1986)).   Specifically, the appellate court took note of the bounty of

evidence that the jury heard about Muhammad's prior violent acts:

> [D]efendant testified Muhammad and the victim 'jumped him' and 'beat [him]
> up' with 'their fists and their feet' less than a week before the shooting.
> Muhammad also testified he and the victim were involved in a physical
> altercation with defendant a week prior to the shooting.   Moreover, on redirect-
> examination, Muhammad testified that he pled guilty to a charge of battery on two
> women on July 12, 2012, in exchange for a conditional discharge.   Muhammad
> further testified that while on conditional discharge, he was 'caught' in another
> case and a violation of conditional discharge was filed against him and later
> withdrawn as a result of a plea agreement.

*Id.* at ¶ 93.

Even if the state appellate court's decision rested, primarily or totally, on state

evidentiary grounds, this Court must determine "whether the application of a state evidentiary

rule violated a defendant's [constitutional] right to present a defense."[4]   *Fieldman v. Brannon*,

969 F.3d 792, 800 (7th Cir. 2020) ("In this context, the last word does not belong to state law; it

belongs to the Due Process Clause of the Fourteenth Amendment to the Constitution.") (quoting

*Kubsch v. Neal*, 838 F.3d 845, 853 (7th Cir. 2016)).

The Compulsory Process Clause of the Sixth Amendment guarantees the right of a

defendant to "obtain[] witnesses in his favor."   *Makiel v. Butler*, 782 F.3d 882, 907 (7th Cir.

2015).   This right, "together with the Due Process Clause of the Fourteenth Amendment,

embodies a substantial right to present a meaningful and complete criminal defense."   *Id.*

(internal quotations and citations omitted).   This right is "in plain terms . . . the right to present

---

[4]  The state appellate court's denial of this claim on state, as opposed to constitutional, law begs the
question whether this Court reviews this claim under the highly deferential standard of § 2254(d) or *de
novo*.   *See Fieldman v. Brannon*, 969 F.3d 792, 799 n.2 (7th Cir. 2020); *Caffey v. Butler*, 802 F.3d 884,
894, 898 (7th Cir. 2015).   But as this opinion explains, Petitioner's due process/compulsory process
claim is without merit, such that no matter which review standard this Court uses, it reaches the same
result.

the defendant's version of the facts as well as the prosecution's to the jury so it may decide

where the truth lies." *Id.* (quoting *Washington v. Texas*, 388 U.S. 14, 19 (1967)).

To establish a violation of the right to compulsory process, Petitioner must demonstrate

"(1) the testimony would have been 'both material and favorable' to his defense," *id.* (quoting

*United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)), and "(2) the exclusion was

'arbitrary' or 'disproportionate' to the evidentiary purposes advanced by the exclusion." *Id.*

(quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (citations omitted)).   The exclusion

of evidence is "material only if there is a reasonable likelihood that the testimony could have

affected the judgment of the trier of fact." *Harris v. Thompson*, 698 F.3d 609, 627–28 (7th Cir.

2012) (citing *Valenzuela-Bernal*, 458 U.S. at 874); *see also Chambers v. Mississippi*, 410 U.S.

284, 302–303 (1973); *Caffey v. Butler*, 802 F.3d 884, 896 (7th Cir. 2015).

Strictly speaking, the state appellate court did not expressly address the materiality of the

excluded character evidence.   Even so, its conclusion that the exclusion was harmless is a

roughly equivalent analysis. *See Caffey*, 802 F.3d at 900 ("Although the court analyzed the

issues under state law rather than *Chambers*, its harmless-error analysis was essentially the same

as the *Chambers* materiality inquiry."); *see also Harris*, 698 F.3d at 626–27, n.6 & 7 (collecting

cases holding that a determination of no harmless error meant the excluded evidence was not

material).   The lingo is different, but the substance is similar.

Based on the record, this Court concludes that the omitted evidence was not material, and

would not have made a difference at the trial.   As the state appellate court found, there was

"ample evidence presented as to Muhammad's violent character and the relationship between

Muhammad and [Petitioner]." *See* 6/30/16 Direct Appeal Order, at ¶ 93 (Dckt. No. 13-4).   The

jury was well aware that there was mounting hostility between Petitioner, Muhammad, and the

victim in the weeks leading up to the shooting based on the testimony of both Muhammad and Petitioner about their prior physical altercations. *See* Trial Tr. (Dckt. No. 13-13, at 656–59, 680-87); Trial Tr. (Dckt. No. 13-14, at 373–75) (trial testimony about Muhammad's violent acts against Petitioner before the shooting incident).

In fact, the jury heard it from Muhammad himself. Muhammad admitted to receiving a conditional discharge for a battery involving two of Petitioner's proffered character witnesses, Ms. Scott and Ms. Burke, and to violating the terms of his conditional discharge two months later. *See* 6/30/16 Direct Appeal Order, at ¶ 93 (Dckt. No. 13-4); *see also* Trial Tr. (Dckt. No. 13-13, at 691–92) (trial testimony regarding Muhammad's violent acts and arrests following the shooting incident).

So the jury did hear that Muhammad had a history of violence. The only evidence about Muhammad's violent character that was completely absent was evidence of the aggravated assault involving police officers that occurred over a year after the shooting.

That evidence would not have moved the needle. The jury heard considerable evidence about the prior physical altercations between the parties involved in the shooting, including Muhammad's role. The jury also heard Muhammad's own admissions about his violent acts. Viewing the record as a whole, there is no "reasonable likelihood" that additional testimony on this point "could have affected" the jury's verdict. *See Harris*, 698 F.3d at 627–28.

Petitioner cannot satisfy the second part of the test, either. It is not enough to show that the trial court should have admitted the evidence. Petitioner must show that the "exclusion was 'arbitrary' or 'disproportionate' to the evidentiary purposes advanced by the exclusion." *Makiel*, 782 F.3d at 907.

18

Here, the trial court ruled that evidence about Muhammad's violent character would not advance the ball. Petitioner asserted self-defense, but he wasn't exactly asserting self-defense against *Muhammad*. Petitioner testified that Muhammad shot first, but Petitioner did not claim that he returned fire *at Muhammad* to protect himself, but hit Lindsey in the process. Instead, Petitioner testified that he shot the Taurus, and shot in the air. *See* 6/30/16 Direct Appeal Order, at ¶ 72 (Dckt. No. 13-4); *see also id.* at ¶ 63 ("Defendant exited the vehicle with the handgun. . . . Defendant fired the weapon, but he did not aim at anyone. He fired once at the side of the vehicle, and two more times in the air.") (summarizing Petitioner's testimony).

The character evidence was about a bystander, not the victim. Muhammad's violent character has less of a bearing if Petitioner was not shooting back at Muhammad to protect himself. At the very least, that evidentiary ruling under state law was not so arbitrary or disproportionate that it ran afoul of federal constitutional protections.

Petitioner cannot establish that the character evidence about Muhammad was material or that his constitutional rights to compulsory process and to present his defense were violated. The Court denies Petitioner's habeas claim about the evidence of Muhammad's character.

### B. Ineffective Assistance of Appellate Counsel (Claim II)

Next, Petitioner brings a claim of ineffective assistance of appellate counsel. The argument has three parts, but he raised only one of them in state court. As explained below, the other two parts are new, so they are procedurally defaulted. *See Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007) ("[T]he failure to alert the state court to a complaint about one aspect of counsel's assistance will lead to a procedural default.").

The first argument involves the sufficiency of the evidence. Petitioner claims that appellate counsel was ineffective because he failed to argue that the evidence was insufficient to support a conviction of first degree murder under a theory of accountability. *See* Petition, at 5

(Dckt. No. 1). He argues that the State "did not present any evidence that Petitioner did not commit the murder" (*i.e.*, that the evidence would only be sufficient to show Petitioner was the principal, not an accomplice). *Id.* at 8.

For purposes of this Court's review, the relevant decision is the state trial court's dismissal of the claim in the first stage of post-conviction proceedings. That order is the last reasoned opinion on the merits. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) ("[T]he federal court should 'look through' [an] unexplained decision to the last related state court-decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.").

Applying *Strickland v. Washington*, 466 U.S. 668 (1984), the post-conviction trial court determined that Petitioner could not demonstrate that appellate counsel's performance was constitutionally deficient because a sufficiency of the evidence claim would have been meritless on direct appeal. *See* 11/17/20 Post-Conviction Trial Court Order, at 18–21 (Dckt. No. 13-7). Based on the "consistent, credible testimony from numerous [State] witnesses," the state court concluded there was "sufficient evidence of [P]etitioner's guilt that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 18–19 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) ("[T]he relevant question [on review of the sufficiency of the evidence] is whether, after viewing the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.") (emphasis in original)).

The state court also ruled that Petitioner's argument about accountability was unavailing under Illinois law:

> Petitioner misunderstands the theory of accountability. "A conviction under accountability does not require proof of a preconceived plan if the evidence

20

indicates involvement by the accused in the spontaneous acts of the group."
*People v. Cooper*, 194 Ill.2d 419, 435 (2000). Proof that the defendant was
present during the perpetration of the offense, that he maintained a close
affiliation with his companion after the commission of the crime, and that he
failed to report the crime are all factors that the trier of fact may consider in
determining a defendant's legal accountability. *People v. Taylor*, 164 Ill. 2d 131,
141 (1995); *People v. Willis*, 2013 IL App (1st) 110233, ¶ 79. A defendant may
be found guilty under an accountability theory even though the identity of the
principal is unknown. *Cooper*, 194 Ill.2d at 435.

*Id.* at 19–20.

In short, the state court concluded that the evidence was sufficient to support a theory of

accountability under Illinois law. *Id.* at 20. A number of facts supported that decision.

Petitioner and another occupant of the vehicle were both armed. Petitioner got into a verbal

altercation with the victim. Petitioner fired a gun multiple times in the vicinity of the victim.

And Petitioner fled the scene without calling the police. That's more than enough.

The post-conviction trial court's conclusion is not contrary to clearly established federal

law. That court correctly noted that claims of ineffective assistance of appellate counsel are

governed by *Strickland. Id.* at 18; *see also Smith v. Robbins*, 528 U.S. 259, 285–86 (2000).

*Strickland* requires Petitioner to demonstrate that the failure to raise an issue on direct appeal

was objectively unreasonable, and that there is a reasonable probability Petitioner would have

prevailed on appeal but for the error. *See Smith*, 528 U.S. at 285–86.

This Court must "look at the issues that appellate counsel failed to raise, and determine

whether that issue was obvious and clearly stronger than issues that appellate counsel did raise."

*Walker v. Griffin*, 835 F.3d 705, 709 (7th Cir. 2016) (internal quotations and citations omitted).

Appellate counsel will not be found ineffective for failing to raise a meritless claim. *See*

*Warren v. Baenen*, 712 F.3d 1090, 1104 (7th Cir. 2013).

Here, the argument had no merit. Illinois law permits defendants to be indicted as a

principal for first degree murder, but convicted under a theory of accountability. *See Lane v.*

*Uchtman*, 2009 WL 4788780, at *9 (N.D. Ill. 2009) ("Under Illinois law, '[a]ccountability is not in and of itself a crime. Rather the [accountability] statute is a mechanism through which a criminal conviction can be reached.'") (quoting *People v. Hicks*, 693 N.E.2d 373, 376 (Ill. 1998)); *see also People v. Ceja*, 789 N.E.2d 1228, 1247 (Ill. 2003); *People v. Perez*, 725 N.E.2d 254, 266 (Ill. 2000) ("In Illinois, a person is legally accountable for another's criminal conduct when '[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense.") (quoting 720 ILCS 5/5-2(c).

As the post-conviction trial court noted, several witnesses – including Petitioner himself – placed Petitioner at the scene, with a gun, shooting in the vicinity of the victim. And while there was conflicting testimony over who shot the bullet(s) that killed Lindsey, a rational jury could narrow it down between Petitioner or his companion that emerged from the vehicle with him. At that point, the jury could convict Petitioner for first degree murder under a theory of accountability.

Given the strength of the record against Petitioner, it was reasonable for the post-conviction trial court to conclude that a challenge to the sufficiency of the evidence would have been meritless, and thus reject Petitioner's ineffective assistance claim. *See Warren*, 712 F.3d at 1104. So, this Court rejects Petitioner's first argument about the ineffectiveness of appellate counsel.

Petitioner also raises two other arguments about appellate counsel. He claims that his appellate counsel should have objected to trial counsel's alleged ineffective assistance. Also, he argues that appellate counsel should have challenged the trial court's accountability instruction, and the trial court's failure to enter judgment notwithstanding the verdict.

But Petitioner is not entitled to federal habeas relief on these remaining claims about appellate counsel because they were not raised through one complete round of state court review. *See Boerckel*, 526 U.S. at 845.

Petitioner preserved his ineffective assistance claim based on his challenge to the sufficiency of the State's evidence to support his conviction. But he did not fairly present the factual basis supporting his ineffective assistance of appellate counsel claims based on the errors he attributes to his trial counsel, or the errors he attributes to the trial court, to each level of state court on either direct appeal or in post-conviction proceedings. That is, he never asked the state courts to consider whether appellate counsel was ineffective for not raising the points about trial counsel's errors or the trial court's errors.

Instead, the claims are procedurally defaulted because Petitioner raised these allegations for the first time in his § 2254 petition in federal court. *See Lewis*, 390 F.3d at 1026 (finding the claims procedurally defaulted for petitioner's failure to pursue either claim on direct appeal or in post-conviction proceedings).

The Court acknowledges that Petitioner raised the respective errors of trial counsel and the trial court in his post-conviction petition for leave to appeal, but raising the claims before one state court is not sufficient to preserve the claims for this Court's review. Instead, each level of the state court system must get the opportunity to hear the claims. *See Stevens*, 489 F.3d at 894 (explaining that the failure to present a complaint about one aspect of counsel's assistance to *each level* of state court will result in the procedural default of the claim).

Despite the procedural default, the Court may still consider the claims if Petitioner "can demonstrate cause for the default and prejudice, or that the failure to consider his claims would constitute a miscarriage of justice." *Martin v. Zatecky*, 749 F. App'x 463, 464 (7th Cir. 2019);

*Lewis*, 390 F.3d at 1026 (citations omitted); *see also Farmer v. United States*, 867 F.3d 837, 842 (7th Cir. 2017). Petitioner cannot excuse his defaults through either cause and prejudice, or a fundamental miscarriage of justice.

Cause for an excused default is an "'objective factor, external to [Petitioner] that impeded his efforts to raise the claim in an earlier proceeding.'" *Weddington v. Zatecky*, 721 F.3d 456, 465 (7th Cir. 2013) (quoting *Smith v. McKee*, 596 F.3d 374, 382 (7th Cir. 2010)). Examples of cause include: (1) interference by officials, making compliance impractical; (2) a factual or legal basis that was not reasonably available to counsel; or (3) ineffective assistance of counsel. *See Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007) (citing *McCleskey v. Zant*, 499 U.S. 467 (1991)).

To show a fundamental miscarriage of justice, a petitioner must show actual innocence. *See Schlup v. Delo*, 513 U.S. 298, 329 (1995). And to show actual innocence to defeat a default, Petitioner must demonstrate that "'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggins v. Perkins*, 569 U.S. 383, 386 (2013) (quoting *Schlup*, 513 U.S. at 329). This is a "demanding" and "seldom met" standard. *Id.* (citing *House v. Bell*, 547 U.S. 518, 538 (2006)).

Petitioner must present new, reliable evidence that was not presented at trial − such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence − to make a credible claim of actual innocence. *See House*, 547 U.S. at 537 (citing *Schlup*, 513 U.S. at 324); *see also McDonald v. Lemke*, 737 F.3d 476, 483−84 (7th Cir. 2013) (quoting *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("[A]dequate evidence is 'documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who places him out of the city, with credit card slips, photographs, and phone logs to back up the claim.'")).

Here, Petitioner makes no such showing. He has not demonstrated cause and prejudice, or actual innocence. In fact, Petitioner does not even attempt to make any such argument. Respondent pointed out Petitioner's procedural default, but Petitioner failed to file a reply brief rebutting the point.

Accordingly, Petitioner's claims that appellate counsel was ineffective for failing to challenge trial counsel's performance and the trial court's decisions are procedurally defaulted.

### C. Double Jeopardy (Claim III)

Petitioner's last claim is about double jeopardy. But the claim lands in the same place. Once again, Petitioner did not raise this point in state court, so he is procedurally barred.

Here too, Petitioner did not raise his double jeopardy claim through one complete round of state court review. Instead, it was only presented to the Supreme Court of Illinois in his post-conviction petition for leave to appeal. So, Claim 3 is procedurally defaulted. *See Boerckel*, 526 U.S. at 845.

Petitioner does not argue any basis for avoiding his defaults. And he didn't take advantage of the opportunity to file a reply brief to address Respondent's procedural default argument, either. *See* 10/28/20 Minute Entry (Dckt. No. 11) (issuing Petitioner's deadline to file a reply brief). Because Petitioner has not demonstrated cause and prejudice or actual innocence, the Court will not review his procedurally defaulted claims. *See U.S. ex rel. Monegan v. Page*, 1999 WL 1267719, at *5 (N.D. Ill. 1999).

For the reasons stated above, this Court cannot grant federal habeas relief for any of Petitioner's claims. His § 2254 petition is denied.

### III. Certificate of Appealability and Notice of Appeal Rights

Petitioner is advised that this is a final decision ending his case in this Court. If Petitioner wishes to appeal, he must file a notice of appeal with this Court within 30 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1).

Petitioner need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if Petitioner wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

The Court declines to issue a certificate of appealability. Such a certificate "may not issue 'unless the applicant has made a substantial showing of the denial of a constitutional right'" or error with this Court's procedural determinations. *Slack v. McDaniel*, 529 U.S. 473, 483–85 (2000) (quoting 28 U.S.C. § 2253(c)). Petitioner must show that reasonable jurists could debate whether this Court should have resolved his claims differently or that the issues are "adequate to deserve encouragement to proceed further." *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th

Cir. 2008) (citing *Slack*, 529 U.S. at 484) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Petitioner cannot meet this standard.

## IV. Conclusion

Petitioner's habeas corpus petition (Dckt. No. 1) is denied on the merits. Any other pending motions are denied as moot. The Court declines to issue a certificate of appealability. The Clerk shall: (1) terminate Respondent David Gomez and replace him with Petitioner's current custodian, Dr. Catherine Larry, Joliet Treatment Center, (2) alter the case caption to *Russell v. Larry*; and (3) enter a judgment in favor of Respondent and against Petitioner.

Date: January 30, 2023

Steven C. Seeger
United States District Judge